# IN THE GENERAL COURT OF JUSTICE
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No.: 1:26-cv-414

| | | |
|---|---|---|
| **AMANDA WATKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **CLUBCORP USA, INC. D/B/A** | ) | |
| **INVITED CLUBS; CLUBCORP** | ) | |
| **FINANCIAL MANAGEMENT** | ) | |
| **COMPANY; BERMUDA RUN** | | |
| **CC, LLC,** | | |
| | | |
| **Defendants.** | | |

_____

NOW COMES Plaintiff Amanda Watkins, by and through counsel, and files this Complaint against Defendants ClubCorp USA, Inc. d/b/a Invited Clubs, ClubCorp Financial Management Company, and Bermuda Run CC, LLC, alleging as follows:

## JURISDICTION AND VENUE

1. Plaintiff has instituted this action pursuant to (a) Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000 *et seq.* (Title VII), (b) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C.A. § 1981, *et seq*., and (c) the common law of North Carolina. Plaintiff seeks to recover damages for the violation

of her protected rights under federal and state law. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2. The acts complained of occurred within, and each party is a resident of the Middle District of North Carolina. Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391.

**PARTIES**

3. Plaintiff Amanda Watkins ("Plaintiff") is a resident of Davie County, North Carolina, is a White female, and at all times relevant was an "employee" of Defendants within the meaning and definition of Title VII, 42 U.S.C. § 2000(e), 42 U.S.C.A. § 1981, and the common law of North Carolina.

4. ClubCorp USA, Inc. d/b/a Invited Clubs ("Defendant Invited Clubs") is a company with a principal place of business in Irving, Texas. Invited Clubs is the largest owner and operator of private clubs in North America, with more than 150 properties across the United States, Washington, D.C., and Mexico. Upon information and belief, Defendant Invited Clubs conducts business throughout the state of North Carolina and the United States. At times pertinent to this action, Defendant Invited Clubs was an "employer" of Plaintiff within the meaning and definition of Title VII, 42 U.S.C. § 2000(e), 42 U.S.C.A. § 1981, and the common law of North Carolina.

2

5. Defendant ClubCorp Financial Management Company ("Defendant ClubCorp") is a company with a principal place of business in Irving, Texas. Upon information and belief, Defendant ClubCorp conducts business throughout the state of North Carolina and the United States. At times pertinent to this action, Defendant ClubCorp was an "employer" of Plaintiff within the meaning and definition of Title VII, 42 U.S.C. § 2000(e), 42 U.S.C.A. § 1981, and the common law of North Carolina.

6. Defendant Bermuda Run CC, LLC, ("Defendant BRCC" or "the Club") is a private country club based in Davie County, North Carolina, with a principal place of business in Irving, Texas. Upon information and belief, Defendant BRCC conducts business throughout North Carolina and the United States. At times pertinent to this action, Defendant BRCC was an "employer" of Plaintiff within the meaning and definition of Title VII, 42 U.S.C. § 2000(e), 42 U.S.C.A. § 1981, and the common law of North Carolina.

7. Defendants BRCC and ClubCorp issued and were listed as the Plaintiff's employer on the Plaintiff's IRS Form W-2s for the years 2022-2024.

8. Plaintiff is informed and believes, and thereon alleges, that at all times relevant herein, Defendant Invited Clubs dominated, controlled, and operated Defendants BRCC and ClubCorp, to such a degree that there existed a unity of

3

interest and ownership between them such that the separate personalities of Invited Clubs and BRCC and ClubCorp ceased to exist.

9. Plaintiff is informed and believes that there existed a unity of interest and ownership among Defendants such that each functioned as an alter ego of the others.

10. Upon information and belief, Defendants operated in an integrated manner with respect to Plaintiff's work, including but not limited to the joint setting or approval of work schedules, assignment of tasks, supervision of daily work, provision of tools and equipment, maintenance of personnel files, and administration of compensation and timekeeping.

11. Defendants shared or allocated among themselves key employer functions affecting Plaintiff, including hiring and onboarding processes, training and performance oversight, issuance of workplace policies, discipline, and the authority to terminate or otherwise materially affect the continuity of Plaintiff's employment.

12. For example, Plaintiff's employment benefits, onboarding, recruitment, and HR complaints were filed, maintained, and performed with Invited Club employees, and the employees followed Invited Club handbooks, policies, and procedures.

13. Upon information and belief, Defendants jointly determined, influenced, or ratified Plaintiff's rate of pay, method of pay, and compensation

4

structure, including overtime eligibility and calculation, and jointly maintained or had access to Plaintiff's time and pay records.

14. Defendants held out to Plaintiff and to the public that they were affiliated or operated in a coordinated enterprise with respect to the location(s) where Plaintiff worked, including shared branding, signage, uniforms, email domains, handbooks, and onboarding materials.

15. Defendant Invited Clubs lists Bermuda Run County Club as one of their member clubs on their website, which manages membership applications, career opportunities, and scheduling tours of the club.

16. As a result of the foregoing, Plaintiff was jointly and simultaneously employed by all Defendants under applicable employment standards, rendering Defendants jointly and severally responsible for compliance with all employment discrimination laws.

17. Based on this collective employment, all Defendants are jointly and severally liable to Plaintiff.

18. Plaintiff reserves the right to amend these allegations to conform to proof following discovery regarding capitalization, financial records, intercompany transfers, observance of corporate formalities, and the identities and roles of officers, directors, and owners of Invited Clubs and any related entities.

5

## FACTS

19. Plaintiff is a White female.

20. Prior to being hired by Defendants, Plaintiff worked for the Winston-Salem Police Department (WSPD) for 16 years as a law enforcement officer. During her career in law enforcement with the WSPD, Plaintiff was a top performer each year, served as a Field Training Officer for 11 years, and received multiple awards and certificates, as well as promotions and merit-based pay increases.

21. Plaintiff holds a graphic design degree from Appalachian State University, which she received in 2004.

22. Following her exemplary career in law enforcement, in 2022, Plaintiff decided to pivot to a new career path to better utilize her degree and have more flexibility with her schedule and work-life balance.

23. In approximately November of 2022, a member of the Club sent Plaintiff a job posting from the Defendants for the Private Event Director role, after they had had a previous conversation about Plaintiff looking for a career path change. Plaintiff then contacted James Gelfand, the Defendants' General Manager, to express her interest in the role.

24. Mr. Gelfand indicated that the Private Event Director role had been filled, but a few weeks later, based on the strength of her background, he contacted

6

the Plaintiff to let her know that a Member Experience Director role had opened and invited her for an interview.

25. Following Plaintiff's interview with Mr. Gelfand, he encouraged her to leave her position with the police department, and he believed that Plaintiff's skillset as the Member Experience Director would help "turn the club around."

26. Plaintiff accepted the job offer and was hired by Defendants in December of 2022 as a Member Experience Director, with duties including marketing, branding, member relations, event planning, running director meetings, general administration, and assisting the General Manager in his absence if needed.

27. At the time of her hire, Plaintiff's supervisor was Mr. Gelfand, General Manager, and in approximately late April of 2023, Brian Meeks became General Manager and Plaintiff's supervisor. Mr. Meeks remained her supervisor until her termination. Hereafter, the General Manager.

28. As Mr. Gelfand expected, Plaintiff exceeded all legitimate expectations of her employment and fostered strong relationships with colleagues, guests, and members of the Club.

29. For example, Plaintiff rarely received complaints from her employees, received no verbal or written reprimands, warnings, or discipline, and received positive feedback from members on a monthly basis.

7

30. Plaintiff would ask for performance evaluations from the General Manager, but was told that he did not need to, because she was doing such a great job, the evaluation was not needed.

31. During her employment with the Defendants, Plaintiff was praised for the speed at which she completed her training and was ultimately designated as a point of contact for all employees and was told she was the only one who could manage it and be trusted.

32. Event registration grew from Plaintiff's marketing and success, including significant growth in the number of teams in the Charity Classic Golf Tournament, increased numbers attending the Community Fall Festival, and sold-out wine dinners.

33. Members, staff, and the community praised new events that Plaintiff started or brought back after years, including the Mother and Son Dance, Community Vendor Market, Dueling Pianos, Cigar Lounge, Trivia Tuesdays, and Walking West Wednesdays.

34. On multiple occasions, the General Manager told her that he could not do the job without her, and she received frequent praise from outside vendors for communication and professionalism.

**Defendants' Alcohol Policy**

8

35. Defendants' practices expressly encouraged and permitted the consumption of alcohol by employees who were directors or higher while on the job for member relations.

36. Upon her hire, Mr. Gelfand informed Plaintiff that it was expected during social events to have an alcoholic drink with members to improve member relations.

37. Although this was standard practice for the Defendants, it made the Plaintiff uncomfortable because she did not like the idea of employees, even directors, consuming alcohol on the job, as it could lead to problems, including safety and security concerns, in the workplace.

38. Therefore, during most events, Plaintiff refrained from drinking on the job, unless a member asked her to sample a drink during an event, or if it was directed by her supervisor.

39. Defendants' **written** policies and practices prohibited all other employees below the director position from drinking alcohol on the job.

40. However, Plaintiff quickly observed that those policies were never enforced.

41. Plaintiff's background in law enforcement provided training and experience in observing if someone was intoxicated. On more than one occasion, Plaintiff reported one or more employees, specifically Food and Beverage staff, for

9

appearing intoxicated after engaging in heavy drinking or smoking marijuana on the job.

42. For example, the Plaintiff observed the Restaurant Manager pouring alcohol into his cup during work events and reported this violation of company policy to the General Manager.

43. Plaintiff witnessed a golf employee severely intoxicated at another event, cursing in front of members, and Plaintiff asked the General Manager to take action. The General Manager also observed this behavior and took no action against the employee.

44. The General Manager dismissed the Plaintiff's reports.

45. Instead of disciplining the employees, the General Manager would tell the Plaintiff to "lighten up", "don't take the rules so seriously", and that this was "not a police department", and that there would always be "loose" behavior.

46. The General Manager told the Plaintiff that her expectations for a professional environment were too high.

47. The General Manager did not take any disciplinary action against the Restaurant Manager or enforce the policy because members "liked" him.

48. The General Manager's actions, as described above, made clear that the Defendants had **no** policy or practice prohibiting the consumption of alcohol by employees. In fact, the opposite was true.

10

49. The General Manager's failure to enforce the alcohol policy at any time served as a waiver of the policy.

**Defendants use Race as an Employment Factor**

50. On or about September 2023, Defendants hired Shelby James, a Black female, as Food and Beverage Director. Ms. James was responsible for managing the Food and Beverage department and employees. Hereafter, the Food and Beverage Director.

51. Before the Food and Beverage Director's hire, Plaintiff was sharing some of the job duties of the Food and Beverage Director, including running food and beverage meetings, writing policies for food and beverage and pool staff, training employees, bartending, and running wine dinners.

52. Plaintiff was encouraged and hoped that the Food and Beverage Director's arrival would relieve her of these duties so that Plaintiff could focus on excelling in her role as Member Experience Director.

53. Unfortunately, following the Food and Beverage Director's hire, Plaintiff became aware that the Food and Beverage Director was struggling to cover her expected job duties.

54. Plaintiff was required to change her schedule and reabsorb the Food and Beverage Director's job duties due to her unexpected absences and inexperience.

11

55. For example, Plaintiff was required to work a non-scheduled Saturday to assist with bartending because the Food and Beverage Director failed to show up for work.

56. Employees of the Defendants began to complain to the Plaintiff about the Food and Beverage Director because of her absences and the quality of her work.

57. Given these personal observations and numerous employee, member, and vendor complaints, in January of 2024, Plaintiff complained to the General Manager about the unfair workload, the poor quality of the work being done by Ms. Jame, and low morale.

58. The General Manager cautioned Plaintiff that the Food and Beverage Director were filing complaints about Plaintiff to Human Resources (HR), and if they were to both begin filing complaints with HR, Defendants would fire Plaintiff because she is White, and the Food and Beverage Director is Black.

59. The General Manager stated that the Defendants would do this because it was easier to fire White employees as compared to Black employees; therefore, her race would be the deciding factor for the Defendants if they both continued to file complaints.

60. Nevertheless, if the Food and Beverage Director were to be disciplined at some point in the future, the General Manager advised the Plaintiff to email him her concerns to begin building a paper file against the Food and Beverage Director's

12

performance, and that the Plaintiff should "let the members suffer" and not try to repair or pick up the slack created by the new Food and Beverage Director in order to ensure that members also complained to management about the Food and Beverage Director to build a case against her.

61. The above made clear to Plaintiff that her race was being used as a factor in any decisions about her employment.

### Sexual Harassment Complaints

62. Plaintiff also began to observe a pattern of sexual harassment by an employee and the employees who reported to her and took steps to get the sexual harassment to stop.

63. Beginning in approximately early 2023, Plaintiff began experiencing strange behavior by the Restaurant Manager. Plaintiff recalled one instance in which he approached her in her office, attempted to hug her, and she told him to "back off".

64. After this incident, employees, specifically other servers, began complaining to the Plaintiff of unwanted sexual harassment by the Restaurant Manager. This included making inappropriate comments about the employees' dresses, whispering in their ears, getting too close and touching them inappropriately, putting his hand on their arm/shoulders, and grabbing their hands.

65. Upon learning this, Plaintiff immediately reported the harassment. The first complaint was made to the former Food and Beverage Director in February

2023. Plaintiff then made a complaint in May of 2023, again in September of 2023, and finally in February 2024.

66. These reports were made to the General Manager and the Food and Beverage Director during directors' meetings, or Plaintiff would pull them aside immediately after learning this information. However, nothing was done to stop this behavior.

67. Despite the numerous complaints, the unwanted sexual harassment continued, and Plaintiff's employees continued to report the hostile work environment to the Plaintiff. This continued for approximately 9-11 months, and Plaintiff continued to report to the General Manager and the Food and Beverage Director.

68. The General Manager directed the Plaintiff not to report the Restaurant Manager's behavior to human resources (HR), and to instead follow the "chain of command" and to let him handle it.

69. However, the sexual harassment did not stop, and employees continued to complain that they felt like they were being subjected to a hostile work environment.

70. Despite her repeated pleas, it was clear that the General Manager was not going to take steps to eliminate sexual harassment in the workplace.

14

71.     As a result, for the first time, in late February/early March of 2024, Plaintiff reported the unwanted behavior to human resources for the Defendants and not just to the General Manager.

72.     After Plaintiff reported to human resources, the General Manager told the Plaintiff that he was "upset" with her for not following the chain of command and making the sexual harassment complaint with HR.

73.     Aside from one follow-up from HR, asking "when you mention previous incidents, expand", Plaintiff was not contacted by human resources again following her report with any further investigative questions.

### Plaintiff's Termination

74.     Following all of the above, the General Manager decided to terminate Plaintiff because of her race and for complaining of sexual harassment.

75.     Despite previously supporting the Plaintiff, the General Manager began siding with the Food and Beverage Director and using her complaints to justify terminating the Plaintiff.

76.     On March 22, 2024, Plaintiff was called into a surprise meeting where she was terminated for "doing the Food and Beverage Director's job" and for drinking alcohol during a member event.

15

77. During this same event, four other employees were consuming alcohol and were not terminated. Plaintiff only consumed as she was instructed or encouraged by the General Manager.

78. Plaintiff believes that her termination was because of her race, White, and for engaging in protected activity of reporting that two employees had complained of sexual harassment.

## ADMINISTRATIVE REMEDIES

79. Plaintiff timely filed EEOC Charge No. 435-2024-01106 on or about June 18, 2024. On November 20, 2024, Plaintiff filed an Amended Charge of Discrimination.

80. The EEOC issued a Notice of Right to Sue on February 11, 2026, and this action is filed within 90 days of receipt.

## FIRST CLAIM FOR RELIEF

*(Retaliation in Violation of Title VII, 42 U.S.C. § 2000e-3)*

81. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

16

82. At all times pertinent to this action, Plaintiff, a female employee of Defendants, and her female co-workers were protected by Title VII against sex discrimination and harassment.

83. Nevertheless, throughout her employment with Defendants, Plaintiff and her female co-workers were subjected to unwelcome sex-based discrimination and harassment by the Restaurant Manager that was persistent and pervasive.

84. As set forth above, Plaintiff reported the unlawful sex discrimination and harassment by the Restaurant Manager to Defendants on a number of occasions to Defendants.

85. Plaintiff engaged in protected activity by complaining in February of 2023, May of 2023, September of 2023, and February of 2024 about the complaints of sexual harassment.

86. Plaintiff further engaged in protected activity by filing an internal HR complaint in late February/early March of 2024.

87. Defendants wrongfully and intentionally retaliated against Plaintiff because of her complaints of and opposition to sex discrimination in the workplace in violation of 42 U.S.C. § 2000e-3, as follows:

a. Discriminating against Plaintiff based on the selective enforcement of the alcohol policy, but her co-workers who did not complain of sexual harassment were not disciplined;
b. Subjecting Plaintiff to materially adverse actions, including her termination on March 22, 2024, following and because of her protected

17

activity.

c. Reprimanding Plaintiff based on false charges and accusations without conducting a fair investigation; and

d. Terminating Plaintiff's employment.

88. As a proximate result of Defendants' acts of retaliation against Plaintiff, Plaintiff suffered substantial damages, including loss of income and benefits and other economic losses; mental anguish and emotional distress; loss of reputation and quality of life, and other damages to be proven at trial.

89. Defendants' retaliatory actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants deliberately punished Plaintiff for exercising her right to report race discrimination and file an EEOC charge. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages under 42 U.S.C. § 1981a.

90. Plaintiff is entitled to appropriate relief pursuant to Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.*, including compensatory damages and reasonable attorneys' fees and costs for her representation pursuant to 42 U.S.C. § 2000e-5(k).

## SECOND CLAIM FOR RELIEF

*(Race Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2)*

91. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

18

92. At all times pertinent to this action, Plaintiff, a White employee of Defendants, was protected by Title VII from race discrimination and harassment in the workplace.

93. Specifically, Defendants wrongfully and intentionally discriminated against Plaintiff because of her race in violation of 42 U.S.C. § 2000e-2, as follows:

a. Discriminating against Plaintiff based on the selective enforcement of the corrective action system, but her Black co-workers did not; and
b. Terminating Plaintiff's employment.

94. As a proximate result of Defendants' acts of discrimination against Plaintiff, Plaintiff suffered substantial damages, including loss of income and benefits and other economic losses; mental anguish and emotional distress; loss of reputation and quality of life, and other damages to be proven at trial.

95. Defendants' actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants deliberately terminated Plaintiff because of her race. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages under 42 U.S.C. § 1981a.

96. Plaintiff is entitled to appropriate relief pursuant to Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.*, including compensatory damages and reasonable attorneys' fees and costs for her representation pursuant to 42 U.S.C. § 2000e-5(k).

19

## THIRD CLAIM FOR RELIEF
*(Race Discrimination in Violation of Section 1981 of the Civil Rights Act of 1866)*

97. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

98. Notwithstanding the at-will nature of Plaintiff's employment, 42 U.S.C. § 1981 provides that all persons shall have the same right to make and enforce contracts regardless of race. 42 U.S.C. § 1981 protects against race discrimination in employment relationships.

99. Plaintiff, a White female, had an employment relationship with Defendants that constituted a contract within the meaning of 42 U.S.C. § 1981.

100. Defendants intentionally discriminated against Plaintiff on the basis of her race (White) by terminating her employment.

101. Defendants intentionally discriminated against Plaintiff because of their stated belief that White employees are easier to terminate than Black employees.

102. Plaintiff's race was a but-for cause of Defendants' decision to terminate her.

103. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff has suffered lost income and other fringe benefits, emotional distress,

20

humiliation, damage to her professional reputation, and other compensatory damages.

104. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendants' officers, directors, and partners participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

105. Plaintiff is entitled to back pay, front pay, fringe benefits, compensatory damages for emotional distress, and other pecuniary losses, punitive damages, pre-judgment, and post-judgment interest, attorneys' fees and costs, a tax-adjustment on any lump sum payment, and any other relief the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
*(Wrongful Discharge in Violation of Public Policy)*

106. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

107. It is the public policy of North Carolina, as expressed in N.C. Gen. Stat. § 143-422.2, to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of

race, religion, color, national origin, age, sex, or handicap by employers that regularly employ 15 or more employees.

108. It is the public policy of North Carolina that an employee not be discharged or otherwise retaliated against for raising issues concerning the above public policies in the workplace, and for adhering to his or her duties as prescribed by both law and policy.

109. The Defendants wrongfully discharged Plaintiff in violation of North Carolina's public policies by discharging her on the basis of her race and for retaliation for her complaints of sex discrimination based on those policies.

110. As a direct and proximate result of the wrongful termination of Plaintiff in violation of the public policy of North Carolina, Plaintiff has suffered substantial damages, including but not limited to loss of income and benefits, loss of professional reputation, loss of quality and enjoyment of life, mental anguish and emotional distress, and other damages to be proven at trial.

111. The Defendants' acts, as described above, were willful, wanton, and malicious, and evinced an intentional or reckless indifference to and disregard for the rights of Plaintiff. Aggravating circumstances concerning Defendants' conduct are provided in ¶¶ 19-65 above. Accordingly, Plaintiff is entitled to punitive damages in an amount be determined by the jury in accordance with Chapter 1B of the North Carolina General Statutes

22

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against the Defendants, jointly and severally, in her favor and award the following relief:

a.  To be reinstated to her position or to a substantially equivalent position;

b.  To recover of Defendants pay and restoration of all benefits;

c.  To recover of Defendants compensatory damages in an amount to be determined by the jury in an amount in excess of $25,000;

d.  To recover of Defendants punitive damages in an amount to be determined by the jury in an amount in excess of $25,000;

e.  To recover the costs of this action and reasonable attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k) and 42U.S.C. § 1988;

f.  To recover pre-judgment and post-judgment interest on all sums awarded;

g.  That this Court enjoin Defendants from engaging in further violations of Title VII and require appropriate corrective measures;

h.  That this Court grant such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

demands a trial by jury on all issues so triable.

This the 8$^h$ day of May, 2026.

DAGGETT SHULER,
ATTORNEYS AT LAW

/s/Benjamin P. Winikoff
Benjamin P. Winikoff (49625)
2140 Country Club Road
Winston-Salem, NC 27104
Phone: (336) 464-0862
Facsimile: (336) 464-0864
Email: **bwinikoff@daggettshulerlaw.com**
*Attorney for Plaintiff*

24